2021 IL App (2d) 21-0460-U
No. 2-21-0460
Order filed January 11, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* ESTATE OF T.A. | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | Nos. 20-F-11, 19-P-150 |
| | ) | |
| | ) | Honorable |
| (Michelle Anderson, Petitioner-Appellant, v. | ) | Joseph M. Grady, |
| Austin Cady, Respondent-Appellee). | ) | Judge Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Jorgensen and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court's decision to terminate grandmother's guardianship of minor and transfer possession to father, a fit parent, was not against the manifest weight of the evidence. Affirmed.

¶ 2   Petitioner, Michelle Anderson, grandmother of T.A., appeals from an order of the trial court granting the petition of T.A.'s father, respondent. Austin Cady, to terminate her guardianship of T.A. and to award him sole custody, principle allocation of parenting time, and sole

responsibility for parenting the minor child. Petitioner seeks relief only from the court's parenting rulings. For the reasons that follow, we affirm.[1]

¶ 3                                        I. BACKGROUND

¶ 4     In November 2016, the circuit court of Allen County, Indiana, entered an order providing that respondent is the biological father of T.A., awarding custody of the child to her biological mother, Bailey Dahl, and reserving parenting time for respondent. T.A. was subsequently removed from the possession of Bailey Dahl and transferred to petitioner, T.A.'s maternal grandmother.

¶ 5     On March 13, 2019, an order was entered in Kane County, Illinois, (case number 19-P-150) appointing petitioner plenary guardian of T.A. and her sister, T.E., and C.A.S.A. was appointed guardian ad litem. No notice of service or return of service upon respondent appears in the record for the March 13 petition or court date. On March 28, 2019, petitioner filed an additional motion seeking to be appointed guardian of the two minors. Notice of this motion listed respondent with a Fort Wane, Indiana, address. In September 2019, an order was entered in the same case providing for respondent to have weekly unsupervised visitation with T.A. and to participate in transitional therapy with T.A. and her counselor.

¶ 6     In November 2019, petitioner filed a petition to modify, seeking to be awarded continued sole parental responsibility for the care and control of T.A. until respondent "can demonstrate that he has the requisite knowledge and understanding to effectively parent" her. Petitioner further sought an order requiring respondent "to participate in therapeutic counseling with the minor child

_____

[1] Our disposition in this accelerated case was due January 10, 2022. Given extensions to the briefing schedule, we have good cause for the delay pursuant to IL S. Ct. R. 311(a)(5) (eff. July 1,2018).

and counselor until a determination is made that is in the best interests [of T.A.] for the parental responsibilities for the care and control of [T.A.] to be modified."

¶ 7 In January 2020, the court found that "the transitional therapist is not performing as ordered and intended" and terminated transitional therapy. Also, in January 2020, Bailey Dahl filed a petition to allocate parental rights and responsibilities (case number 20-F-11). Attorney James Jensen was appointed guardian ad litem of N.A. in that cause.

¶ 8 On April 15, 2020, in case number 19-P-150, respondent filed a petition to terminate petitioner's guardianship of T.A. Petitioner filed a response in August 2020. In November 2020, CASA, which had been reappointed guardian ad litem in this cause, submitted a report to the court recommending that T.A. remain under respondent's guardianship and "continue to be provided regular visits and phone calls" with petitioner. In December 2020, the court consolidated cases numbered 19-P-150 and 20-F-11 and discharged court-appointed guardian ad litem CASA.

¶ 9 On January 13, 2021, petitioner was given leave to intervene. She filed a motion to allocate parenting responsibilities and parenting time between herself as guardian of T.A. and respondent. A trial was held on the competing petitions of respondent and petitioner on June 7, 8, and 10, 2021.

¶ 10                                    The Trial

¶ 11 Petitioner testified that she is a 49-year-old home healthcare worker, or nursing assistant. She is in a six-year relationship and has four grown children. Her daughter Bailey had two children, T.A., five and a half years old, and T. E., four, both of whom currently live with petitioner. Her partner and his nine-year-old son also live with her. T.A. calls her "mom" and T.A.'s partner, "papa." They live in a five-bedroom house in Aurora, Illinois, where T.A. and Tessa choose to share a room. T.A. interrelates with nine cousins; she and one cousin have sleepovers.

¶ 12    Petitioner paid for T.A.'s prenatal care and helped deliver her, and T.A. has lived with her most of her life. According to petitioner, Bailey "really didn't have any interest in being a mother anymore." Over the years, petitioner has made all of the medical, educational, and religious decisions for T.A.

¶ 13    When petitioner filed her petition for guardianship of T.A. and Tessa in 2019, she listed her occupation as "bartender" and gave respondent's address as "Indiana." She was issued letters of office as T.A.'s guardian but was told by the court she needed to give notification to respondent. She reapplied two weeks later listing a full address in Fort Wayne for respondent. Bailey signed a consent to the guardianship in April 2019.

¶ 14    According to petitioner, respondent met T.A. for the first time in April 2019 when he was in Illinois for "a court proceeding." She believes he had known of T.A.'s existence since proceedings in Indiana in 2016 established paternity and set child support. In September 2019, after the court ordered visitation and transitional counseling, until the trial in June 2021, father and daughter averaged less than monthly meetings, always in Illinois. Petitioner never brought T.A. to Indiana for visitation. Respondent and T.A. did not meet for an eight-month period in 2020 due to petitioner' belief that the Covid19 restrictions in place in Illinois at that time were prohibitive. [2] Also, respondent's son, who lived with him, contracted Covid-19 in March of 2020.

---

[2] During petitioner's cross-examination, the trial court took judicial notice of Governor Pritzker's Covid-19 executive order entered March 20, 2020, which lists court-ordered "transfer of children pursuant to a custody agreement" as permitted "essential travel."

¶ 15 Several visits ended with respondent bringing home a "distraught, crying" T.A. early; in text messages, he complained that T.A. was "disrespectful," "out of control," even "mean." Respondent told petitioner that he believes in corporal punishment; petitioner does not.

¶ 16 Petitioner believes that "every child should have a relationship with their father" and that she has "made every effort" to support T.A.'s relationship with respondent. T.A. and respondent have weekly Zoom calls on Tuesdays and Thursdays, lasting from five to fifteen minutes depending on how long T.A. stays engaged. Numerous texting communications between petitioner and respondent, mostly regarding scheduling and cancelling of visitation, were introduced at trial.

¶ 17 Petitioner's "spouse's family" owns a lake home in Elk Horn, Wisconsin, and they go there every weekend possible, at least a dozen times over the course of a year; the trip is about one hour and forty minutes from her home in Aurora. Petitioner's mother lives in the Smoky Mountains in Tennessee; petitioner has taken T.A. to visit her three times in the past four years. That trip is just under nine hours. She has also taken T.A. to Kentucky Lake, a six-hour drive. When asked how many times she took T.A. to Indiana since the case was filed, petitioner answered: "Zero. I was told that was not my responsibility."

¶ 18 Jessica Rogers, T.A.'s primary teacher when she started at Ivy Academy in 2019, and now area director for the school, testified that T.A. has always been "at the top of the charts" for academics. Although she was in the lower portion of the emotional/social scale for children her age when she began at the school three years ago, she is now "on the top end of her age bracket" for emotional/social skills. Rogers described T.A.'s relationship with Tessa, who also attends the school, as "conjoined at the hip," if they could be. Petitioner works very hard to make sure both girls excel in school. Rogers has seen respondent at the school "once or twice."

¶ 19    James Jensen testified that during his tenure as GAL he has had "half a dozen or more" telephone conferences with both petitioner and respondent and met T.A. on "probably half a dozen" occasions. In March 2020, he reported to the court that respondent needed to "step it up" since he was not a factor or force in T.A.'s life during the first three years of her life and that he had some doubts as to petitioner's commitment to the reintegration of father and daughter. He sat down with them after court and reached an agreement that there would be a sequence of weekend visitations in Illinois and several in Indiana. However, respondent's son was suspected of having Covid and went into quarantine, and the contemplated visitation never got "off the ground."

¶ 20    When the pandemic first arrived, Jensen was privy to e-mails from petitioner indicating that respondent could not have any in-person visitation because Illinois was in "total lockdown," which was "somewhat of a mischaracterization of what the governor had done." Accordingly, reunification has "sputtered" but has never "gone in the right direction," which Jensen finds to be "unfortunate."

¶ 21    When Jensen first met T.A. in March 2020, she was happy to talk with him about spending time with her father: "[i]f anything, she went from this happy and engaging child to a more happy, more engaging child when dad was brought up." But in the ensuing 15 months, there was a change. Now, when he asks about seeing her father, he feels "a little bit of stress building up in in her." She gives what he thinks are "sort of canned answers that he spanks me, or that he's mean to me, or I don't want to go to Indiana."

¶ 22    Jensen would describe T.A.'s relationship with petitioner as "loving. [She] obeys grandmother very well." T.A. and Tessa act "like you would expect two little sisters to act." Jensen believes T.A. is stable living with petitioner, and he considers stability "to probably be the number one factor in most of my investigations."

¶ 23    Respondent's relationship with T.A. is "going in the wrong direction *** because of the lack of in-person involvement between the parties." Jensen knows of no substantial steps petitioner has taken to make sure T.A. has a loving relationship with respondent, other than setting up their Zoom conversations. He also had a concern about respondent's "staying power" in March 2020 due to his absence from T.A.'s life from 2016 until 2019 and finds the lack of effort to seek out the child "puzzling." He finds the fact that respondent had 17 visits in the 83 weeks prior to the trial "somewhat troubling" and also acknowledges that petitioner did not drive T.A. to Indiana to see respondent during that time.

¶ 24    Jensen believes that it could be emotionally and psychologically detrimental to T.A. to relocate to Indiana to live with her father without having spent any time in his home there. He also believes that reunification should be the goal. When pressed by counsel as to T.A.'s best interests with respect to who should have primary residential control and parenting responsibilities, Jensen stated: "I would punt the ball. I'd kick the can down the road and somehow, someway see if we could have reunification therapy that works in this case that both parties buy into." When pressed further, he said: "Well, if you're going to take away from me my effort to answer your question, then, I would have to say [petitioner]." "At the end of the day," he thinks that reunification is best for T.A.

¶ 25    Respondent testified that he is 30 years old and works out of his home as an area manager of operations with Averhealth. He is currently married for the second time. Prior to their marriage, respondent and his first spouse had one child, Ranger, born in 2014, who lives with him and his current wife in a four-bedroom house. T.A. is his second child; he broke off his brief relationship with her mother, Bailey Dahl, after he found drugs in his home. He did not know she was pregnant until he was notified of paternity proceedings and his child support obligations in September 2016.

A third child is the product of a relationship he had in 2018 after separating from his ex-wife. The child resides primarily with her mother, though respondent has parenting time "[a]t least every other weekend." He married his current wife in January 2021. She works on the administrative side of a substance abuse clinic and is pregnant with his fourth child.

¶ 26 Respondent testified that he has objected to petitioner's guardianship petition from the time he learned of it in 2019. He attributed the accounting of his seventeen visits in eighty-three weeks partially to his need to care for his other minor children but also to petitioner's having "sabotaged" his relationship with T.A. by "actively coaching my daughter against me, having improper conversations with her, and *** actively lying and misinterpreting the Governor's order regarding a lockdown." Petitioner has enrolled T.A. in gymnastics, which conflicts with the time respondent is supposed to have parenting time. T.A. reported that petitioner had told her that he was going to take her out of Illinois to Indiana to live with him and she would never see her sister or petitioner again. Petitioner told respondent that the therapy sessions were supposed to occur with just T.A. and he was not supposed to be present, and she had communications with the therapist that were never relayed to him.

¶ 27 Respondent testified that on several visits, when T.A. had emotional outbursts, he would bring her back to petitioner's house early, because he did not have "a proper place to parent" in Illinois. He believes that a "public venue is not an appropriate place to parent a child." It can be an embarrassing moment for a child, and not because it would involve corporal punishment.

¶ 28 He agreed that he should take the initiative to see T.A. and stated that he had asked to come visit T.A. on "numerous occasions" in the last eight months, but petitioner relayed "the information that Illinois is on a total lockdown, and that people driving to Illinois from Indiana must quarantine

10 days in advance." Due to the "active coaching" and the "alternative arrangements that are made for every visitation attempt," he and T.A. have a "toxic, damaged relationship."

¶ 29    Respondent stated that he would be the one who would take care of T.A. after school, as he works from home. He acknowledged that she "may need intense family therapy for a short period of time" following the transition. He believes it is in T.A.'s best interest to be separated from the sister and family she knows in order to live with him because "she deserves the right to grow up knowing her father, having him in her life, as well as her other siblings.

¶ 30                           The Trial Court's Decision

¶ 31    The trial court found that T.A. "appears to be thriving" under petitioner's guardianship, whose home and living arrangements "appear to provide a stable environment for the child." The court also noted its concern about respondent's relationships with multiple women, including the fact that he has fathered four children with four different women, stating that "has been his choice and will be his responsibility."

¶ 32    The court noted that throughout the history of the case the CASA GAL, GAL Jensen, and the court have "recommended, encouraged and ordered transitional therapy" for respondent and T.A. and, further, that the one attempt at therapy was unsuccessful because the therapists selected were not qualified. The court found that respondent has made "less than a diligent effort to develop a relationship" with T.A., but that some of his efforts have been "obstructed" by petitioner, usually because "she and the child were going somewhere or doing something with [petitioner's' family when [respondent] had made plans with [petitioner] or on his own to visit the child." Petitioner has "done little to further a relationship" between respondent and T.A. and "has done nothing unless the action or conduct required of her to foster such relationship is specifically ordered by the court." As examples, the court cited petitioner's refusal to do any transportation of T.A. to visit

respondent and her scheduling therapy sessions when respondent was working and unable to participate.

¶ 33    The court agreed with GAL Jensen's opinion that unification of T.A. with her father "should be the objective of the parties and the Court, but not at this time." The court found, however, that if petitioner's guardianship were to continue, "it is unlikely that the unification *** will move any closer to accomplishment than it has throughout the history of this case." Accordingly, the court granted respondent's petition to terminate guardianship as of July 15, 2021, and ordered that respondent shall "take possession of" T.A. no later than August 1, 2021.

¶ 34    The court then granted petitioner's motion for stay pending appeal and included in its order the directive that petitioner shall drive T.A. to respondent's Indiana residence "every other weekend starting on August 14, 2021," with visitation to begin at 10: a.m. on Saturday and end at 12:00 p.m. on Sunday, at which time petitioner shall pick up T.A. from respondent's residence and transport her back to petitioner's residence in Illinois.

¶ 35                                    II. ANALYSIS

¶ 36    Petitioner does not appeal from the termination of her guardianship, nor from the trial court's award of sole custody to respondent. Her only contention on appeal is that the court's orders giving respondent the principal allocation of parenting time and sole responsibility for parenting are not in T.A.'s best interests. Those orders, like the termination of petitioner's guardianship, are custodial in nature. See Black's Law Dictionary (11th ed. 2019) (custody is the "care, control, and maintenance of a child"; sole custody is "full control [of] and sole decision-making responsibility" for a child); see also Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/official (last visited Dec. 15, 2021) [https://perma.cc/HWC2-PCCC]. ("guardian" and "custodian" are synonymous). Thus, in this

case, we do not view the responsibility for parenting of T.A. separately from her guardianship and custodial arrangements.

¶ 37    We will not disturb a trial court's determination relating to custody unless it is against the manifest weight of the evidence. *In re Estate of K.E.S.*, 347 Ill. Ap. 3d 452, 461 (2004). A decision is against the manifest weight of the evidence where the opposite conclusion is apparent or the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Id.*

¶ 38    Petitioner argues that once standing is determined, the "best interests of the child is the paramount consideration to which no other takes precedence," quoting *In re Austin*, 214 Ill. 2d 31, 46 (2005). The *Austin* court's remark, however, was made in the context of "an order of disposition regarding the custody and guardianship of a minor ward." *Id.* As petitioner does not challenge the trial court's disposition of the custody and guardianship of T.A., she has forfeited this point regarding best interests. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("[p]oints not argued are forfeited"). Forfeiture aside, the supreme court later abrogated *In re Austin*. See *In re M.M. and J.M*, 2016 IL 119932, ¶¶ 27, 28 (repudiating the proposition that "the best interest standard trumps all" and holding that "section 2–27(1) of the [Probate] Act [705 ILCS 405/2–27(1) (West 2012)] does not authorize placing a ward of the court with a third party absent a finding of parental unfitness, inability, or unwillingness to care for the minor").

¶ 39    Petitioner's best interests arguments avoid any mention of respondent's parental rights. See *Troxel v. Granville*, 530 U.S. 57, 68–69 (2000) (holding a Washington grandparent visitation statute unconstitutional as applied because it allowed the petitioners to proceed straight to a best-interests analysis without any deference accorded to the parent's decision to limit grandparent visitation). Our supreme court in *M.M.* recognized that it is "beyond discussion that parents have a fundamental liberty interest in the care, custody, and control of their children." *Id.* ¶ 26 (citing

*Troxel*, 530 U.S. at 65–66). Further, "as a matter of constitutional law, 'there is a presumption that fit parents act in the best interests of their children.' " *Id.* (quoting *Troxel*, 530 U.S. at 68). In this case, no evidence was presented that respondent is an unfit parent. On the other hand, GAL Jensen opined that respondent was a fit parent, an Indiana court found him to be a fit and proper parent during the custody proceedings over his first child, and petitioner conceded the point during closing arguments.

¶ 40    The trial court's decision to reunite T.A. with her father recognizes respondent's parental rights and, because respondent has not been proven to be an unfit parent, presumes that reunification is in T.A.'s best interests. The court's findings that petitioner has obstructed respondent's efforts to develop a relationship with T.A. and has done little to foster a relationship between them are not against the weight of the evidence. Nor is its conclusion that "it is unlikely that the unification of the child with her father will move any closer to accomplishment than it has through the history of this case" against the manifest weight of the evidence. Accordingly, the court's orders granting respondent's petition to terminate guardianship and transferring possession of T.A. to respondent are affirmed.

¶ 41    Respondent requests that we vacate the stay of judgment pending appeal and "order the immediate turnover of his daughter." However, because the potential harshness of an immediate transfer of possession may be somewhat ameliorated by the ordered visitation at respondent's home every other weekend during the stay, we deny respondent's requests.

¶ 42                                III. CONCLUSION

¶ 43    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 44    Affirmed.